Filed 3/6/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re L.G., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>                    v.<br><br>M.G.,<br><br>    Defendant and Appellant. | A173218<br><br>(Contra Costa County<br>Super. Ct. No. J24-00703 ) |

M.G. (mother) appeals from juvenile court orders asserting jurisdiction over her daughter L.G., removing L.G. from her custody, and requiring mother to submit to a substance-abuse assessment and random drug tests as a condition of reunification.

We conclude that the juvenile court's jurisdictional findings are supported by substantial evidence, but we agree with mother that substantial evidence does not support the juvenile court's finding that there were no reasonable means to protect L.G. without removing her from her mother's care.  We also agree that there is no substantial evidence that Contra Costa County Children and Family Services (the Bureau) made reasonable efforts to prevent or eliminate the need for removal, and further that the juvenile court erred by failing to state the facts on which it based its removal findings.  Accordingly, we reverse the dispositional orders.

## BACKGROUND

### I.

Mother lived with mental illness since before L.G. was born. In 2014, when mother was a teenager, she received a diagnosis of Major Depressive Disorder. Family members reported that she struggled with her mental health for many years.

In September 2018, mother entered the army. In February 2019, after she missed two unspecified tests and the army discovered she had an undisclosed prior mental health diagnosis, she received an Other Than Honorable medical discharge. Based on her time in the army, the Department of Veterans Affairs (Veterans Affairs) provided her with health care services.

After the discharge, mother struggled with substance abuse and mental health. She moved around a lot and sometimes was homeless. In 2022, Veterans Affairs diagnosed her with Complex Post Traumatic Stress Disorder, Borderline Personality Disorder, Insomnia, and an eating disorder. She also received treatment for alcohol abuse.

In 2023, while living out of state, mother became pregnant with L.G. She was homeless, living in motels, and physically sick, and she had no family nearby to help care for her. She moved back to California so she would have a place to live and family support. In May 2024, she moved into an apartment with her sister (maternal aunt).

L.G. was born on July 2, and she lived with mother and maternal aunt in the apartment. When L.G. was a day old, the Bureau investigated mother for general neglect, but it determined that the allegation was unfounded.

L.G.'s maternal grandparents met L.G. when she was about two months old. Thereafter, they regularly provided babysitting, including

2

taking L.G. every weekend. They also regularly provided financial support so mother could buy food and baby supplies.

Mother took L.G. to her two- and four-month well-baby appointments. At the four-month visit, on November 5, L.G.'s weight was in the 50th percentile, and her height was at or above the 50th percentile. The record indicates mother may have ignored or canceled other appointments.

## II.

In mid- to late November, mother's mental health struggles escalated. According to mother, she had been receiving services through Veterans Affairs, but they were terminated because of scheduling conflicts. Around November 12, mother stopped taking all prescribed medications. She had suicidal thoughts and struggled anywhere from six to ten on a scale of zero to ten depending on the day.

On Sunday, November 24, maternal aunt called Contra Costa County mental health, and two people came to the apartment to check on mother. L.G. was at maternal grandmother's during the visit. Mother reported that the next day, Monday, November 25, maternal aunt moved out of the apartment.[1] Maternal aunt said that she moved out because mother's "emotions [were] out of control." She reported that mother "couldn't relax" and was being "very negative" because of her borderline personality disorder. She said that on a scale of zero to ten, mother's behavior was around a six, and that when it was over a five she couldn't deal with mother.

---

[1] The Bureau's December 11 detention/jurisdiction report indicates that maternal aunt reported the date as November 2. The parties do not address the discrepancy.

The following day, on Tuesday, November 26, mother underwent surgery. She said the provider gave her fentanyl against her wishes. She was concerned about "being drugged" because of her history with addiction.

The same day, the Bureau received an allegation that mother was neglecting L.G. The allegation stated that mother was observed to be "erratic[]" due to her borderline personality disorder, had made statements that people were "drugging" her, and expressed suicidal ideation.

According to mother, maternal grandparents were isolating her and not returning her texts. They would not let her come over for Thanksgiving on Thursday, November 28. Mother considered suicide that day. But she reached out to a friend who helped her calm down. On Sunday, December 1, mother participated in telephone therapy with a licensed therapist through BetterHelp.com (BetterHelp).

The next day, on Monday, December 2, the Bureau conducted an in-person home assessment in response to the November 26 allegation. According to the Bureau, L.G. "was dressed in clean clothing and had no apparent marks or bruises." The home met the "minimum sufficient level for safety and care" and was "free of any observable safety threats or hazards," though it was disorderly, "with clothing and household items on the floor throughout . . . ." The Bureau did not see any sleeping furniture for L.G.

During the assessment, mother "attend[ed] to L.G. throughout the interview," holding her, feeding her, and changing her clothes. She washed L.G.'s pacifier after it fell on the floor. When mother laid L.G. on the bed, she set up a portable camera so she could observe L.G. from the kitchen. The Bureau saw mother feed L.G. four or five 8-ounce bottles of formula within about one hour. Mother did not burp L.G., and L.G. spit up her formula more than once.

4

Mother described her mental health history and recent struggles. She disclosed her diagnoses and her suicidal thoughts, and she said she had stopped taking her prescribed psychiatric medication. She said she was told she should not have stopped the medications without tapering off. She reported that she had attended a therapy session the previous day and that she had an online appointment with the Veterans Affairs medication prescriber scheduled for December 10.

With mother's consent, the Bureau invited maternal grandmother to come to the apartment, which she did. Maternal grandmother told the Bureau that mother had "not been stable," had been "texting family members in the middle of the night," and had been "behaving erratically." She also said mother had a long history of financial irresponsibility, homelessness, and substance abuse.

Mother and maternal grandmother agreed to a safety plan, which involved maternal grandmother providing primary care to L.G. and applying for legal guardianship "due to [mother's] current mental health concerns."[2] According to the Bureau, the arrangement would allow mother to seek "therapeutic engagement to address her various mental health issues, suicidality, and non-compliance with mental/behavioral health related medications." According to the Bureau, the safety plan also stated that L.G. was in danger of general neglect and that mother had mental health problems and lacked capacity to care for L.G. According to mother, the Bureau told her to get mental health services and a bassinet. Mother and

_____

[2] The quoted language comes from the Bureau's December 11 detention/jurisdiction report describing the safety plan. The record does not include a copy of the plan itself.

5

maternal grandmother worked cooperatively to bring L.G. to maternal grandmother's car and ensure that L.G. had appropriate supplies.

## III.

That same day, after L.G. left the apartment, mother started sending a series of texts to the Bureau for a period that lasted for about five days until December 8. In the first two days, she sent more than 20 texts. Some texts were sent in the middle of the night.

The first text asked, "What happens if my mom doesn't let me see my baby[.]" After that, the texts varied in length, some quite long, most with minimal or no punctuation, and they covered many topics.

Some texts were short. For example, one stated: "The VA Martinez said that I had 'erratic behavior['] when I'm trying to get help for being drugged Sounds good and I have Dec 4 2pm doctors appointment to take out my stitches so sadly I have to wait[.]" Another stated: "Hi I know I didn't do some things at first that's cause I didn't care for myself and gave up on myself sir due to how people treat me Hope you understand[.]"

Several texts stated that mother did not trust maternal grandparents or asserted that maternal grandparents abused mother or her siblings. For example, one stated: "Hi sir I'm sorry to bother you I asked for my daughter back she won't let me have my daughter back cause I don't trust her Have good day byes sorry to bother[.]" Another stated: "My sister said that cause [maternal grandmother] was the worst abuse with my sister and sister hates when [maternal grandmother] calls her mad and being mean to her[.]" Still another stated: "Night my insomnia bad I'm truly scared and made a mistake with allowing [maternal grandmother] in my life but most importantly my daughters life [maternal grandmother] hurt her adopted kids

6

that's not love so she will hurt anyone else silently or out loud trust me Night sir[.]"

In some, mother seemed to acknowledge that she needed help caring for L.G. For example, one stated: "I know I need help. I've been asking for help and I've been trying to do all my own but obviously I can't. I need to go impatient [sic] just give me time and please just call my sister. She's on the phone. She's ready. She knows that you'll be calling[.]" Another suggested that she would support maternal aunt or the older of her two brothers [older maternal uncle] taking legal guardianship of L.G.: "I'm not gonna sign in the court documents for [maternal grandmother] to be legal guard in. I'm only gonna sign it for [maternal aunt] or [older maternal uncle] who is mentally emotionally and financially stable to take care of a child[.]"

In another text, mother wrote that she saw a video in which L.G. was playing with a new toy but maternal grandmother was not playing with her, and had been giving her a different brand of formula from what the doctor recommended. Mother added that she would "ask my Attroney what I can do in this situation where cps social worker wants my abuser adopted mother to be legal guardianship even tho I'm a good mom and willing mom to change my ways for to be a 1,000% mom and a growing mom and I been asking for help but [maternal grandmother] never does. I have texts saved just in case [maternal grandmother] would do the worst of the worst to be take my daughter away from me. I will ask my licensed therapist what to do and if my plan is the best one for me .i been in better help.com that wasn't a lie so please don't think I'm a lair .one therapist ended therapy with my due to me revealing I have been diagnosing with borderline personality disorder but I believe I don't have that after doing tons of research that's reliable information and sources from other mental health professionals I mainly

7

study from psychologist or sociologist and therapist and some social workers depending on education."

This text was followed by another one that included discussion of cutting maternal grandparents out of L.G.'s life and maternal aunt taking legal guardianship of L.G.: "I'm trying to do outpatient therapy so I can learn to manage my emotions and feelings and stressful situations that I encounter in my life but I'm easy cutting off [maternal grandparents] that will be way less stress cutting off people and things that service me no purpose or /and my daughter. Outpatient therapy will as let be a role model for [L.G.] and my sister when she has legal guardianship of my daughter or not I can take care of my daughter after therapy and my daughter can see it's normal to get out and see me change for a better person and see how I react differently and see the positive reaction or appropriate responses. and I don't want my daughter without her mother .my daughter deserves a full time mom willing to always take care of my daughter and 'spoil' Give her everything she needs wants and prays for and I want to show others I can do intensive outpatient therapy and be a great mom or a better mom since I'm getting help I know I need and I want to be the best person I can be for my daughter family and future kids and I'm blessed to have a sister that's willing to help me out because she sees I'm truly scared because I know [maternal grandmother] will try to take [L.G.] ,my daughter from me and [maternal grandmother] will try to make me the crazy one .My siblings all have accurate childhoods that's all very constant and some more abuse /neglect than others[.]"

A longer text started with a reference to "mess[ing] up" regarding substance use and continued with seemingly scattered thoughts about L.G.'s needs and mother's plans for parenting: "Hi yes I was sober from the Oct 30 I messed up last night I feel bad and guilty for it now I'm staying sober I been

8

sober from alcohol since Nov 7 2022 That's the only substances I used to use but slipped up last night cause I was stressed out and wanted to eat more food [L.G.] needs and wants Gates Remove food and water from floor Littler box hidden None in my room or her room Playpen and pack and play Crib and bassinet Floor foam Cart side Refrigerator in room Doctor appointments and shots Covid 19 ,6 months old cdc says it's fine for babies All her shots and appointments Two cars Home owners of two homes so one gets into kids names Kindercare or first 5 play with our babies toddlers her age Look into good schools Sports Education importance Drugs free say no to drugs Wait for sex and safety of sex 9th grade Importance of safety and good communication and self care and self love and confidence I don't know and can't help you when I can't figure it out I would love to know your needs and wants even when I try my best idon't know sometimes I'm learning the best can to take care of your needs and wants i would like you to be feeling safe to be open with me me and I'm missing it as a mom I'm sorry So I can help you out the best way possible and be there to support love and encourage and help and give and provide and protect Travel Stable housing and savings account for [L.G.] school and her presents and positive reforcement Car for [L.G.] 16.5 years old paid off in her name when she graduates high school Phone by 5th grade but iPhone 10 only for friends family fun school distraction games and emergencies and help and luxury Own room by 3-5 years old Love support respect growth great life and family Happiness Protection Providing from mom Guide her the best way I can Ask for help when mom needs it or don't know something In my notes[.]"

In the following days, mother continued to text the Bureau multiple times about varied topics including therapy, her opposition to L.G.'s placement with maternal grandmother, her dissatisfaction with the safety

9

plan, her ability to care for L.G., her intent to get a restraining order against maternal grandmother, and her intent to sue. She also texted pictures of two medications she had picked up from the pharmacy: escitalopram oxalate and trazodone. (Escitalopram is an antidepressant and antianxiety medication. Trazadone is an antidepressant and a sedative.) There is no indication that the Bureau responded to any of the texts.

On Wednesday, December 4, the Bureau set up a group text between the Bureau, maternal grandmother, and mother, so maternal grandmother could post pictures of L.G. for mother. The Bureau explained to mother that the group text was for pictures only. But mother used it to send texts to maternal grandmother.

On Thursday, December 5, mother had a second therapy session through BetterHelp.

The next day, on Friday, December 6, mother went to maternal grandparents' house, which is in a gated community, without invitation. Maternal grandmother reported to the Bureau and the police that mother had been at maternal grandparents' front door since 6 a.m. Maternal grandparents were granted a no trespass order barring mother from the gated community. Later that day, a police officer told the Bureau that mother had been "trespassed" from the property.

On Saturday, December 7, a police officer and the Bureau spoke several times. The Bureau told the officer about the safety plan, but the officer said the police could not enforce it because it was not a legal order. The officer told the Bureau that unless there were an order in place, such as a "DC23," the police would allow mother to retrieve L.G. A DC23 is an authorization for temporary removal of a child from a parent or guardian's custody based on exigent circumstances.

10

That evening, the police officer called maternal grandfather. He said the police were escorting mother to maternal grandparents' house to pick up L.G., and that it would be kidnapping if maternal grandmother left with L.G. But the police officer spoke to the Bureau and agreed to issue a DC23 based on mother's violation of the safety plan. The DC23 authorized temporarily detaining L.G. from mother because "[t]here [was] an immediate danger of substantial physical and/or sexual harm that requires removal of the minor from the parent/guardian." As a result, L.G. remained in the care of maternal grandmother. A detention hearing was set for December 11.

Between the December 2 home assessment and the December 11 detention hearing, the Bureau interviewed mother's siblings, including two brothers. Older maternal uncle said that the family had always struggled with mother's mental health, mother had a history of suicidal ideation and impulse control issues, and she had a history of making things up. He also said that he had never witnessed abuse of his siblings by maternal grandparents and that L.G. was safe with maternal grandmother. The younger of mother's brothers said mother's mental health was " 'not the best' " and that she had struggled with it for " 'many years.' " He said maternal grandmother had not abused him or his siblings and that L.G. was safe with her. He did not consider L.G. to be safe with mother or maternal aunt.

The Bureau also interviewed maternal aunt. She related her reasons for moving out of the apartment on November 25. She said she was returning to live with mother and that she would provide mother financial support. She said L.G. was safe with maternal grandmother, and that she would do what she could to support mother and maternal grandmother in providing care for L.G. She also said mother was planning on going back to Veterans Affairs for mental health treatment.

11

## IV.

On December 10, the Bureau filed the juvenile dependency petition at issue.

At the December 11 hearing, the Bureau submitted its detention/jurisdiction report, which contained a section under the heading "Reasonable Efforts to Prevent Removal of Child." (Capitalization omitted.) The section stated that "[e]fforts were made to prevent or eliminate the need for child's removal from the home, including responding to the referral as well as investigating and assessing the risk to the child . . . ." It also stated the Bureau's efforts included "providing/considering supportive services and a safety plan . . . ." Next, the Bureau had checked four boxes corresponding to the following phrases: "Pub 13, Your Rights Pamphlet," "Gen 22, Documentation of Language Capability and Action Plan," "Surviving Parenthood Guide," and "Differential Response/Path II: Transitional Visit did not occur prior to detention."

The juvenile court found there was a prima facie showing of jurisdiction and ordered L.G. detained. It ordered "[p]arenting education," "[m]ental [h]ealth [s]ervices," and "[c]ounseling" for mother. The juvenile court set January 15 as the jurisdictional and dispositional hearing date, which was later continued to February 19. L.G. remained in maternal grandmother's care.

Between the December 11 detention hearing and the February 19 jurisdictional and dispositional hearing date, mother attended all available visits with L.G. At every visit, she arrived with gifts, such as toys, food, and clothes. She was affectionate and engaged. The Bureau reported that, at times, mother had a difficult time understanding how to do certain things for L.G., but she took directives from the social casework assistant well.

12

Mother lived alone in the apartment she had previously shared with L.G. and maternal aunt. She was being treated every month or three months by a nurse practitioner, who prescribed her escitalopram, trazadone, and another medicine for nightmares. Mother was looking into starting therapy services through Veterans Affairs because she could not afford to pay out of pocket.

Mother enrolled at Southern New Hampshire University and was taking four online classes. She also completed a parenting class online. She attended two other classes through an organization called Families Empowered and Transformed (F.E.A.T.), but she stopped going because she found the content to be common sense and she did not feel she needed it.

In January 2025, L.G. attended a well-child exam, where her weight remained in the 50th percentile and her height was recorded in the 65th percentile.

At the scheduled February 19 hearing, at mother's request, the juvenile court appointed mother a guardian ad litem. The juvenile court found good cause based on the new appointment to continue the jurisdictional and dispositional hearing to March 26.

Before the March hearing, the Bureau tried calling older maternal uncle, but he did not answer, and he did not return the Bureau's voicemail.

**V.**

On March 26, the juvenile court held a bifurcated jurisdictional and dispositional hearing. Maternal aunt attended with mother.

In the jurisdictional phase, after accepting the December 11 detention/jurisdiction report into evidence, the juvenile court turned to the petition, which contained the Bureau's allegations. On a page titled "Failure to Protect," the Bureau alleged that "[t]he child has suffered, or there is a

13

substantial risk that the child will suffer, serious physical harm or illness . . . ." The Bureau had then checked a box that stated, "by the inability of the parent or legal guardian to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."

Next the petition set forth allegations in two sets, the first labeled "b-1" and the second labeled "b-2." The b-1 allegations began with the following sentence: "The child's mother . . . has serious unresolved mental health issues that impairs her ability to provide regular care of the infant . . . as evidenced by . . . ." Six factual allegations designated (a) through (f) followed. These related to mother's diagnoses and mental health symptoms, her text referring to alcohol, and her attempt to retrieve L.G. from maternal grandparents' home. The b-2 allegations began with the following sentence: "The child has suffered, or there is substantial risk to suffer for serious physical harm or illness as evidenced by . . . ." Four factual allegations designated (a) through (d) followed. These related to mother cancelling well-baby appointments, mother overfeeding L.G., the home not containing any sleeping furniture for L.G., and mother changing her mind about the safety plan.

The Bureau proceeded to amend its petition's allegations to conform to proof. First, it deleted from its b-1-a allegation that mother "stated that she is struggling with her mental health diagnoses of . . ." and replaced it with mother "stated that she has diagnoses of . . . ." Second, still in its b-1-a allegation, the Bureau deleted "resulting in impaired judgement and an inability to provide safe care for the child." Third, it deleted in its entirety its b-1-d allegation that "[o]n December 2, 2024, the mother sent a text indicating that she had consumed alcohol after being sober since November

14

2022." Fourth, it deleted in its entirety its b-1-f allegation that after signing a safety plan that put L.G. in maternal grandmother's care, "[t]he mother violated the safety plan and went to the grandmother's home early in the morning demanding to see her baby" and that "[a] Restraining Order was put in place and the mother violated the restraining order in attempts to take her baby from the grandparents." Fifth, from its b-2-c allegation that "the family home was found to not have any type of sleeping furniture placing the infant at risk of harm or death due to unsafe sleep practices" the Bureau deleted "placing the infant at risk of harm or death due to unsafe sleep practices." And, sixth, it dismissed in its entirety its b-2-d allegation that "mother recanted and no longer wanted to agree with the safety plan and wanted the baby back in her care while she continues to have unresolved health needs and remains non-compliant with her prescribed medications."

Next, at the juvenile court's request, the Bureau gave page and line citations to the December 11 detention/jurisdiction report to serve as the Bureau's evidence in support of each allegation. The Bureau did not introduce other evidence.

The juvenile court then paused the hearing to give mother's counsel time to go over the allegations and evidence with mother and mother's guardian ad litem. When the hearing resumed, mother's counsel declined to present new evidence. Instead she argued that the evidence offered by the Bureau was not sufficient to establish jurisdiction.

Among other things, mother's counsel argued that mother's circumstances had changed since the Bureau's December 2 home assessment. Referring to the February 19 disposition report, she said that "mother's position is that she is currently taking medication." She also stated that,

15

"there's no evidence, at this point in time, that [mother] is struggling from erratic behaviors, post-partum depression, or suicidal thoughts."

The juvenile court amended the b-1-e allegation to remove the assertion that mother's text messages "us[ed] threatening language and false statements with the threat to take the child back into her care" and replaced it with "that evidence mother's unstable mental health."

The juvenile court sustained and found true, as amended, allegations b-1-a, b-1-b, b-1-c, and b-1-e. Allegation b-1-a stated, "On or around December 2, 2024, the mother stated that she has diagnoses of Borderline Personality Disorder, Major Depression Disorder, Complex PTSD, and Anorexia and is not medication compliant." Allegation b-1-b stated, "On or around December 2, 2024, the mother admitted that her mental health escalated," and further that "she was experiencing erratic behaviors, struggling with post-partum depression, and suicidal thoughts stating she attempted suicide[3] last on Thanksgiving Day 2024." Allegation b-1-c stated, "[M]other admitted that she stopped taking all prescribed psychotropic medications one week prior to November 19, 2024, without recommendations from the treating physician." And amended allegation b-1-e stated, "Between December 2, through December 8, 2024, [mother] sent numerous text messages to the Social Worker and grandmother that evidence mother's unstable mental health."

The juvenile court found not proven and not a sufficient basis for jurisdiction all the petition's b-2 allegations. Not-proven and insufficient allegation b-2-a stated, "The mother cancelled the baby's well-care appointments as she did not recall making the appointments; therefore she

---

[3] The record does not support the allegation that mother "attempted" suicide. The evidence relating to this incident indicates only that mother "considered" suicide.

16

refused to take the baby to the doctor to receive medical care." Not-proven and insufficient allegation b-2-b stated, "On or about December 2, 2024, the mother fed the infant four or five 8oz bottles of formula in approximately 1 hour without ever burping the infant. The infant spit up the formula more than once." And not-proven and insufficient amended allegation b-2-c stated, "On or about December 2, 2024, the family home was found to not have any type of sleeping furniture. There was no crib, play pen, pack and play, or bassinet."

The juvenile court explained that its decision to find true the amended b-1 allegations and to assert jurisdiction over L.G was based in part on the years-long nature of mother's mental health struggles and her inconsistent treatment.

**VI.**

At the dispositional phase, the juvenile court admitted into evidence the February 19 disposition report and a case plan with the same date. The disposition report included a section with the heading "Reasonable Efforts" (boldface and underscoring omitted), which consisted of the following bullet-point list of Bureau actions: "Investigative interviews"; "Pub 13, Your Rights Pamphlet"; "Gen 22, Documentation of Language Capability and Action Plan"; "Surviving Parenthood Guide"; "Differential Response/Path II: Transitional Visit did not occur prior to detention"; "CLETS/Criminal Background Checks on Mother" . . . "Monthly Face to Face Contact with Child"; "Random Drug Testing Referral for Mother"; "Referrals for Parenting Resources ie: parenting classes, anger management, domestic violence resources, mental health/counseling services for Mother"; "Presumptive Transfer for Katie A Mental Health Assessment Referral for Child"; and "Child and Family Team Meeting." The case plan made recommendations for

17

reunification regarding counseling, parenting education, and substance abuse services. Neither mother nor the Bureau offered other evidence.

The juvenile court found that there was clear and convincing evidence of the circumstances stated in Welfare and Institutions Code section 361, subdivision (c)(1).[4] It further found that the Bureau had made reasonable efforts to prevent or eliminate the need for removal. Accordingly, the juvenile court ordered that L.G. be removed from mother's custody and that she remain in her current placement with maternal grandmother. It did not state the facts on which it based its decision to remove L.G.

For mother to qualify for reunification, the juvenile court required that she engage in mental health services. Specifically, the juvenile court ordered that mother complete individual counseling approved by the Bureau. The therapist would need to confirm that mother understood the factors contributing to dependency, that she had successfully addressed the issues, and that L.G. was not at risk in mother's care. The juvenile court also directed that mother take her medication as prescribed. If mother were to have a concern about a prescribed medication, she would need to raise it with her treating physician and follow the physician's recommendations. The juvenile court also ordered a substance abuse assessment and substance abuse testing.

The juvenile court concluded the proceeding by setting a six-month review hearing.

## DISCUSSION

Mother challenges the juvenile court's assertion of jurisdiction over L.G., its dispositional order removing L.G. from mother's custody, and its

---

[4] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

18

requirement that mother submit to a substance abuse assessment and to drug testing. Amici curiae join the jurisdictional and removal challenges.

**I.**

Under section 300, a court may exercise dependency jurisdiction over a child who has been abused, neglected, or is otherwise at risk of "serious physical harm" because of a parent's abuse or inability to provide adequate care or supervision. (§ 300, subds. (a)–(j).) Subdivision (b)(1) of section 300 is at issue here. It authorizes dependency jurisdiction of a child who "has suffered, or there is a substantial risk . . . will suffer, serious physical harm or illness" as a result of any of a number of specified circumstances. (§ 300, subd. (b)(1)(A)–(D).) Here, the alleged circumstance is "[t]he inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness . . . ."[5] (§ 300(b)(1)(D).)

The government bears the burden of proving jurisdictional allegations by a preponderance of the evidence. (§ 355(a).) Under section 300, subdivision (b)(1)(D), the government must establish, as separate elements, that (1) mental illness (2) makes the parent unable to provide regular care to the child and (3) "this inability has caused the child to suffer serious physical harm or illness or creates a substantial risk of such harm or illness." (See *In re N.R.* (2023) 15 Cal.5th 520, 558 [construing § 300, subd. (b)(1)(D) in context of substance abuse].) The elements must be met "based on the facts in existence at the time of the hearing." (*In re L.W.* (2025) 109 Cal.App.5th 1012, 1017–1018, italics omitted.)

---

[5] The petition also alleged "[t]he willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment." (§ 300, subd, (b)(1)(C).) But the juvenile court's jurisdictional findings did not address this circumstance and the parties do not discuss it on appeal.

Mother does not contest the juvenile court's finding that she was mentally ill as contemplated by section 300, subdivision (b)(1)(D).  Instead, she argues that substantial evidence does not support findings that (1) her mental illness made her unable to provide L.G. with regular care and that (2) such an inability resulted in serious physical harm or created a substantial risk of serious physical harm to L.G.

We review a juvenile court's jurisdictional findings and conclusions for substantial evidence, examining the whole record in a light most favorable to the court's findings and conclusions.  (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216.)  Substantial evidence may include inferences, but the inferences must logically and reasonably relate to evidence in the record.  (*Id.* at pp. 216–217.)

When we review a juvenile court's findings for substantial evidence, we do not reweigh the evidence or resolve evidentiary conflicts.  (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.)  We uphold the finding " 'if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the court might have reached a different result had it believed the other evidence.' " (*Ibid.*)

This standard of review controls our conclusion here.  Although we believe the juvenile court could reasonably have determined that the Bureau did not make an adequate showing, we find sufficient evidence in the record to affirm the court's ruling given the preponderance-of-the-evidence standard that defines the Bureau's burden at the jurisdictional stage.

**A.**

The first question is whether substantial evidence supports the juvenile court's conclusion that mother was unable to provide L.G. with regular care because of her mental illness.  L.G. was eight months old at the time of the

jurisdictional hearing. It is reasonable to infer that "regular care" for L.G. would mean consistent, active supervision. While some evidence suggests that mother would have been able to provide L.G. with such care, there was also substantial evidence in support of the trial court's contrary conclusion.

When mother lived alone, before L.G.'s birth, she struggled to take care of herself. Based on evidence in the record, the juvenile court could reasonably infer her struggles were related to her mental illness. She moved in with maternal aunt shortly before L.G.'s birth so that she would have family support. Starting when L.G. was two months old, mother also relied on maternal grandparents to provide care to L.G. After mother stopped taking her medication, she described having suicidal thoughts and struggling anywhere from six to ten on a scale of zero to ten depending on the day. People described her behavior as "erratic." Based on mother's behavior and "out of control" emotions associated with her mental illness, maternal aunt called Contra Costa County mental health to check on mother and moved out of the apartment.

Mother initially agreed to a safety plan under which maternal grandmother would provide primary care to L.G. and apply for legal guardianship while mother addressed her mental health. In texts to the Bureau, mother appeared to acknowledge that she could not provide L.G. with sufficient care on her own. For example, one text stated, "I know I need a help. I've been asking for help and I've been trying to do all my own but obviously I can't. I need to go impatient [sic] just give me time . . . ."

Despite her recognition that she needed help, by the time of the jurisdictional hearing mother had not established regular therapy—although as we discuss below, the record does not show that the Bureau made reasonable efforts to get her the help she needed. She also lived alone and

did not have a wider support network. Maternal aunt had not moved back in. Older maternal uncle had not returned the Bureau's call and there was no evidence that he would help mother care for L.G. And mother had expressed strong distrust of maternal grandparents, giving rise to a reasonable inference that she would not accept their help.

For these reasons, we conclude sufficient evidence supported the juvenile court's finding that mother's mental illness prevented her from providing the required regular care.

### B.

Next we turn to mother's argument that, even if she were unable to provide L.G. with regular care, substantial evidence does not support a conclusion that the inability resulted in serious physical harm or a substantial risk of serious physical harm to L.G. Amici curiae add that, in particular, the Bureau failed to show a substantial risk of harm based on an individualized assessment and objective facts. As mother and amici note, evidence of mental illness alone cannot support jurisdiction. (*In re L.W., supra*, 109 Cal.App.5th at p. 1022, citing *In re N.R., supra*, 15 Cal.5th at p. 558.)

The Bureau does not argue that L.G. suffered actual serious harm, so we address only whether there was a substantial risk of serious harm. We note that for an eight-month-old child, a lapse of care would pose particular risks. A child of that age cannot feed herself, change herself, call for help, stay home alone, or do any number of things that an older child might be able to do. We evaluate the risk of harm in that context.

We agree with mother that the Bureau cannot rely on some of the issues it cites in support of the juvenile court's implicit finding of a substantial risk of serious physical harm. The juvenile court found both

unproven and legally insufficient to support jurisdiction the alleged grounds of a lack of sleeping furniture for L.G., mother's overfeeding L.G. during the home assessment, and mother's alleged doctor appointment cancellations. Those issues cannot now be raised as support for the juvenile court's conclusion. Likewise, nothing in the sustained allegations mentions substance abuse as a ground for jurisdiction. The Bureau itself struck the only mention of substance abuse from allegation b-1-d for lack of proof. Thus, any "admitted ongoing substance use" would not support jurisdiction. (See *In re David M.* (2005) 134 Cal.App.4th 822, 830 (*David M.*), abrogated in part on another ground by *In re R.T.* (2017) 3 Cal.5th 622, 628–629, ["mother's positive tests for ethanol cannot support jurisdiction, since [the government] did not allege mother's use of alcohol impairs her ability to care for [the children]"].)

But as discussed above, there is evidence in the record that mother was unable to provide regular care, had a history of mental health struggles, was not receiving regular therapy, lacked a second caregiver in the home, and was alienated from maternal grandparents, who had previously provided significant support. If mother were not able to adequately care for herself or L.G., or if she harmed herself or stopped taking her medication (as she had previously and which could trigger or exacerbate other risks), there would be no one to realize what was happening. Applying a preponderance-of-the-evidence standard, the juvenile court could reasonably conclude that these unmitigated risks—again, at the time of the hearing, they had not been mitigated—would put an eight-month-old infant living alone with her sole caregiver at substantial risk of serious physical harm or illness. Such a conclusion rests on more than evidence of mother's diagnoses.

23

Relying on *In re James R.* (2009) 176 Cal.App.4th 129 (*James R.*), abrogated in part on another ground by *In re R.T., supra*, 3 Cal.5th at pp. 628–629, mother argues that, because L.G. was never injured in mother's care, the Bureau faced a "nearly impossible" burden of proving substantial risk. (*Id.* at p. 136.) But although that case involved a mother who had a history of suicide attempts and depression and who had not complied with health care recommendations in the past (*id.* at pp. 131–132, 136), the mother was not solely responsible for the regular care of her children. (*Id.* at p. 132.) She shared parenting responsibilities with the children's father, who was able to protect and supervise the children. (*Id.* at pp. 132, 133, 137.) Extended family assisted with childcare as well. (*Ibid.*) The children were healthy, well cared for, and never unsupervised. (*Id.* at p. 137.) In that context, noting that the mother had not abused or neglected the children in the past, the court found that any causal link between the mother's mental health and future harm to the children was speculative. (*Id.* at pp. 136–137.)

The present case materially differs. Here, during the five-month period of no harm on which mother relies, mother and L.G. lived with maternal aunt and had childcare help from maternal grandparents. At the time of the jurisdictional hearing, by contrast, mother lived alone and, the juvenile court could infer, she was unlikely to allow the help maternal grandparents had previously given. She did not have anyone with whom to share parenting responsibilities, and there was no one else in the home to protect or supervise L.G. In *James R., supra*, 176 Cal.App.4th 129, the risk to the children was low—or "speculative"—because there was a years-long record of no harm in a stable, ongoing family situation with multiple caregivers. (*Id.* at pp. 136–137.) The same is not true here.

Mother cites *David M., supra*, 134 Cal.App.4th 822, for the proposition that the Bureau needed to provide evidence of a specific and defined risk of serious physical harm. Again we find mother's reliance misplaced. In that case, the family came to the attention of the government because the mother tested positive for marijuana metabolites at the time of her younger child's birth. (*Id.* at pp. 825–826.) The newborn tested negative for any drugs. (*Id.* at p. 829.) At issue was jurisdiction over the newborn and his one-year-old brother. (*Id.* at p. 825.) The mother had been involved in a dependency proceeding four years earlier, and the government relied on the records from that proceeding about her mental health and drug use without conducting an independent, current investigation. (*Id.* at pp. 826–827.) The social worker testified that she did not know whether the mother " 'would currently be diagnosed with the same illness,' " and agreed she had "no evidence mother was unable to care for or protect" the children. (*Id.* at p. 827.) The father confirmed that he suffered from "social and anxiety disorder and depression," but the government likewise did not produce evidence that those conditions affected his parenting. (*Id.* at p. 827.) The one-year-old was healthy, well-cared for, and loved, and the home was clean and tidy. (*Id.* at p. 830.) Accordingly, the *David M.* court concluded there was no evidence of a "specific, defined risk of harm" to either child. (*Ibid.*) In context, however, this statement meant that there was no substantial evidence of a current risk: "Certainly, it is possible to identify many possible harms that *could* come to pass. But without more evidence than was presented in this case, such harms are merely speculative." (*Ibid.*)

Here, by contrast, the Bureau conducted a current investigation. As discussed above, the evidence supported a finding that mother was currently suffering from mental illness that had recently caused behaviors that put

L.G. at risk of neglect. The risk was not mitigated by a second adult in the home or a reliable support network at the time of the jurisdictional hearing. In these circumstances, the Bureau was not required to specify the precise harm that might come to L.G. under mother's care. (See *In re Travis C., supra*, 13 Cal.App.5th at pp. 1226–1227.) It was enough that the record supported a substantial risk of *some* serious physical harm or illness. (See *ibid.*)

Citing *In re L.W., supra*, 109 Cal.App.5th at page 1023, mother also argues that the Bureau did not produce sufficient evidence that a substantial risk to L.G. existed specifically at the time of the jurisdictional hearing. In support, she points to the lack of evidence that she was still experiencing suicidal thoughts and to the evidence that she had resumed taking psychotropic medication.

We agree there is evidence that mother's circumstances had changed in some respects. But Mother had an extended history of suicidal ideation that predated L.G.'s birth. During her November escalation, she struggled with thoughts of suicide, and she contemplated suicide on November 28. As of the March jurisdictional hearing, she had not established regular therapy, and she was living alone. The lack of evidence that mother was considering suicide in March did not negate the evidence showing that she experienced suicidal ideation more generally, nor the inference that she could experience such thoughts again given that she was not receiving regular care. Likewise, evidence that mother was taking psychotropic medication again did not negate other evidence in the record—including the undisputed fact that she had abruptly stopped taking her prescribed medications in November—establishing that, as of the jurisdictional hearing date, L.G. would be at substantial risk of serious harm or illness in mother's care.

26

To the extent mother relies more generally on *In re L.W., supra*, 109 Cal.App.5th 1012, we find the case distinguishable.  There, "the only affirmative evidence in the record as to mother's mental health was that, by the time of the jurisdictional ruling, mother was receiving regular treatment for her mental illness through medication as well as care from both a psychiatrist and a therapist." (*Id.* at p. 1020.)  The psychiatrist monitored the mother's medications during that period and expressed the opinion that she " 'appear[ed] to have stable mental health . . . .' " (*Ibid.*)  In addition, the child was eight years old—not an infant—and the mother was not the sole caregiver.  (*Id.* at p. 1014.)  She lived with her sister and the child's stepfather.  (*Ibid.*)  The stepfather had shared parenting responsibilities for the child since she was 11 months old.  (*Id.* at p. 1017.)  We therefore do not find the case sufficiently analogous to be persuasive here.

## II.

Mother and amici curiae challenge the juvenile court's dispositional order removing L.G. from mother's home.  They argue that the Bureau did not show by clear and convincing evidence that (1) L.G. faced substantial danger or (2) there were no reasonable means by which L.G. could be protected.

If a juvenile court exercises jurisdiction over a child, it must decide the appropriate disposition.  (*In re E.E.* (2020) 49 Cal.App.5th 195, 205.)  The court usually chooses between allowing the child to remain in the home, with protective services, and removing the child from the home while the parent engages in services to facilitate reunification.  (*Ibid.*)  Under section 361, subdivision (c)(1), the "child shall not be taken from the physical custody of their parent[]" unless the court finds clear and convincing evidence of two

27

circumstances. (§ 361, subds. (c) & (c)(1).)[6] The first is that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home." (§ 361, subd. (c)(1).) The second is that "there are no reasonable means by which the [child's] physical health can be protected without removing the [child] from the . . . parent's . . . custody." (*Ibid.*) In assessing risk of harm, " ' "[t]he parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." ' " (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

When reviewing a juvenile court's finding that required clear and convincing evidence, we look to "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

## A.

We look first at whether L.G. faced a substantial danger to her physical health, safety, protection, or physical or emotional well-being if she were returned to mother's care. (See § 361, subd. (c)(1).) Mother argues that substantial evidence does not support the court's finding that the Bureau proved such a danger by clear and convincing evidence.

Although we concluded above that the court's ruling was supported by substantial evidence when the Bureau had to show a serious risk of harm by

---

[6] Section 361, subdivision (c), addresses removal when a child resides with the parent at the time the petition was filed, while section 361, subdivision (d), addresses removal when a child does not reside with the parent at the time the petition was filed. (Section 361, subds. (c) & (d).) The relevant standards for removal are the same under both subdivisions.

a preponderance of the evidence, we have some hesitation about the analysis at the dispositional stage when the Bureau bore a heavier burden of proof. L.G. did not suffer serious harm while under mother's care; mother took L.G. to her well-baby appointments; at the December 2 home assessment, the Bureau found that L.G. was dressed in clean clothing and had no marks or bruises; mother's home met the "minimum sufficient level for safety and care" and was "free of any observable safety threats or hazards"; mother was affectionate and engaged with L.G. during supervised visits; at the time of the jurisdictional hearing she was under the care of a nurse practitioner who was prescribing her psychotropic medication; and there is no evidence that she continued to engage in "erratic" behavior such as the texting in early December. In this context, the risks to L.G. might be characterized as "what ifs," but we again emphasize that they were not purely speculative, as mother herself arguably acknowledged in some of her texts to the Bureau and by her initial agreement to the safety plan. And the absence of any other caregiver made those risks greater. Ultimately, however, we need not decide whether the result is different under the clear-and-convincing-evidence standard because, as we discuss below, the Bureau's showing fell short at the next step regardless.

## B.

We look next at whether there were "no reasonable means" by which L.G.'s physical health could have been protected without removing her from mother's custody. (§ 361, subd. (c)(1).) Mother and amici curiae argue that the Bureau did not prove this element by clear and convincing evidence. Amici curiae suggest several lesser interventions that the Bureau could have evaluated. First, they point out that maternal aunt had expressed a willingness to return to support mother and L.G. Next, they argue that the

29

Bureau could have "implemented a family-maintenance plan, provided in-home services, arranged structured check-ins, or connected Mother to disability-competent parenting supports."

We agree with mother and amici curiae that substantial evidence does not support a finding that the Bureau proved by clear and convincing evidence that lesser means were not reasonable or that they would not protect L.G. from the risk of harm. The danger to L.G. stemmed from mother's mental health and related behavior struggles combined with the lack of any other caregiver in the home and familial support outside of it. Although mother's improvements by the time of the hearing (such as her resumption of medication) could have been found insufficient on their own to adequately address the risks to L.G., the Bureau presented no evidence that it had explored interventions to mitigate remaining sources of risk and determined they were infeasible. For example, the Bureau presented no evidence that it had followed up with maternal aunt after she said she would return to live with mother and provide financial support. It presented no evidence that it had evaluated maternal aunt as a second caregiver. And it presented no evidence that it had explored a family maintenance plan under which mother would receive regular counseling, in-home services, parenting supports, or regular check-ins from a social worker. Without any such evidence, the juvenile court could not reasonably conclude that the Bureau met its burden of proof. Accordingly, we reverse the dispositional orders.

### III.

Although we have concluded that the dispositional orders must be reversed in any event, for the benefit of the parties and the court on remand, we also consider mother's argument that (1) the Bureau failed to include a discussion in its disposition report of the reasonable efforts it made to

30

prevent removal, (2) the Bureau did not prove that it made such reasonable efforts, and (3) the juvenile court's decision did not include a statement of facts supporting removal. We find that these contentions have merit.

"Maintenance of the familial bond between children and parents—even imperfect or separated parents—comports with our highest values and usually best serves the interests of parents, children, family, and community. Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons *and subject to careful procedures*." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 530–531, italics added.)

Those careful procedures include the following. When the government recommends removal of a child from a parent's home, its disposition report must include "[a] discussion of the reasonable efforts made to prevent or eliminate removal." (Cal. Rules of Court, rule 5.690(a)(1)(B)(i).)[7] The juvenile court then must determine whether reasonable efforts were made. (§ 361, subd. (e).) The Bureau bears the burden of proving that it made such efforts by a preponderance of the evidence. (Compare § 361, subds. (c) & (c)(1) [specifying clear and convincing evidence standard] with § 361, subd. (e) [not specifying clear and convincing evidence standard].) And, finally, the juvenile court "shall state the facts on which the decision to remove the [child] is based." (§ 361, subd. (e).)

We start with the Bureau's disposition report, which included a section with the heading "Reasonable Efforts." (Capitalization omitted.) The section consisted of a bullet-point list of phrases. As mother points out, the report did not explain what these phrases meant. If any of them purported to

_____

[7] All further rule references are to the California Rules of Court unless otherwise indicated.

31

describe services provided, the report does not state when they were provided or how they were targeted to prevent L.G.'s removal. Some, on their face, seem unrelated to the objective. For example, while "Monthly Face to Face Contact with Child"—it is unclear whether this is referring to contact by the Bureau or by mother—may have been useful for some other purpose, there is no explanation provided for how it helped mother with her mental health struggles or her capacity to care for L.G. on her own. The section does not identify particular risks to L.G. or potential interventions to mitigate those risks, and it does not evaluate any such potential interventions. We conclude that this report section does not meet rule 5.690(a)(1)(B)(i)'s requirement of a "discussion."

We also conclude that the record as a whole does not contain substantial evidence supporting the juvenile court's determination that the Bureau made reasonable efforts to prevent L.G.'s removal from her home. From the Bureau's first encounter with mother and L.G., it seemed to presume that L.G. must reside outside mother's care. There is scant evidence that it considered any alternative, let alone that it made efforts to achieve one.

The Bureau argues that the safety plan was a reasonable effort to avoid removal. We are not persuaded. At the December 2 home assessment, on the strength of one visit (in which the Bureau found the home safe and L.G. unharmed), the Bureau developed a plan that took L.G. out of mother's home and called for maternal grandmother to apply for legal guardianship. There is no evidence that the Bureau contemplated returning L.G. at a specific time or after specific goals were met. In these circumstances, we do not see that maternal grandmother's physical custody of L.G. and her pursuit of legal guardianship would be meaningfully different from removal.

Indeed, when mother changed her mind about the safety plan, there is no evidence that the Bureau tried to accommodate her in any way. For example, there is no evidence that the Bureau considered mother taking L.G. for some days while maternal grandmother helped by taking her on others. Or, short of full days, there is no evidence the Bureau tried to arrange an immediate visit between mother and L.G. or a schedule of regular visits during which the Bureau could assess mother's capacity to care for L.G. There is no evidence the Bureau tried to ascertain whether maternal aunt could move back in, as she said she would, and whether her doing so would render the home safe for L.G. In fact, there is no evidence that the Bureau responded to mother at all.

The disposition report's case plan recommended that, before reunification, mother would need to "enter and successfully complete individual counseling, approved by [the] social worker, and receive a positive evaluation from [the] therapist that [mother] understands the factors contributing to this dependency, has successfully addressed those issues, and the child [is] not at risk . . . ." This recommendation addressed the petition's central sustained jurisdictional ground; namely, mother's inability to provide regular care to L.G. because of her mental illness. Presumably, an alternative to removal would have been to help mother meet the substance of this recommendation *before* removal.

Yet the record contains little to no evidence that the Bureau did so. Though the Bureau asserts that it gave mother referrals for counseling, the only evidence seems to be a "Reasonable Efforts" bullet-point item in the disposition report. The item reads: "Referrals for Parenting Resources ie: parenting classes, anger management, domestic violence resources, mental health/counseling services for Mother." If the Bureau did make a referral for

33

counseling, there is no evidence of the date, there is no evidence of the provider, and there is no evidence that the Bureau followed up with mother to make sure she could access the referred services. (See *In re H.B.* (2024) 106 Cal.App.5th 219, 247 [finding it was unreasonable for government not to follow up with parent regarding services that could have helped address ground for removal].) Instead, the disposition report indicates that, as of February 19, mother could not afford to pay for individual counseling out of pocket and that she was still in the process of seeking mental health care through Veterans Affairs. The bullet-point item is not sufficient evidence of reasonable efforts.

Further, we do not agree with the Bureau that evidence of a parenting-class referral, a drug-treatment referral, or a drug-testing referral amounted to substantial evidence of reasonable efforts. The Bureau's petition alleged only that mother could not provide regular care to L.G. because of the effects of her mental illness. The Bureau itself deleted the only allegation relating to substance use. Thus, these referrals could not have prevented or eliminated the need for removal. (See *In re H.B., supra*, 106 Cal.App.5th at p. 247 ["although the Agency may have referred father to various services, it does not appear on this record that it assisted him in any meaningful way to avoid the children's removal from his custody"].)

Finally, there is no evidence that the Bureau followed up with maternal aunt after interviewing her in December. Maternal aunt said she was returning to live with mother. The Bureau could have contacted her to ask her if she still planned to do so. It could have assessed her as a second caregiver for L.G. and as a support for mother. There is no evidence that it did so.

34

Under section 361, subdivision (e), a juvenile court may not remove a child from a parent's custody without finding that the government made reasonable efforts to prevent or eliminate the need for removal. (*In re H.B., supra*, 106 Cal.App.5th at p. 247.) We conclude the juvenile court's finding in this case is not supported by substantial evidence. Accordingly, the removal order is also subject to reversal on this independent ground.

Finally, we agree with mother that the juvenile court did not "state the facts on which the decision to remove the [child] is based." (§ 361, subd. (e).) The requirement is mandatory, and on remand the juvenile court should comply with it. (*Ibid.*)[8]

---

[8] Mother alternatively argues that the trial court abused its discretion by ordering mother to submit to a substance-abuse assessment and drug testing. As an initial matter, mother did not object to this requirement in the trial court, nor does she argue on appeal that any such objection would have been futile. (See *In re S.F.* (2023) 91 Cal.App.5th 696, 724–725 [failure to object to drug testing and substance abuse treatment in dispositional orders forfeits claim of error unless the record shows that an objection would have been futile].) In any event, we need not reach this argument in light of our reversal of the dispositional orders.

## DISPOSITION

The jurisdictional findings are affirmed. The dispositional orders are reversed and the case is remanded for further proceedings consistent with this opinion. On remand, the juvenile court must make its decision based on the facts existing at the time of the further proceedings. (*In re M.V.* (2022) 78 Cal.App.5th 944, 971, fn. 9; *In re H.B., supra,* 106 Cal.App.5th at p. 247.)

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
MOORMAN, J. *

---

*Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

36

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Honorable Rebecca C. Hardie |
| Counsel for Defendant and Appellant: | Elizabeth A. Thornton, under appointment by the Court of Appeal |
| Counsel for Plaintiff and Respondent: | Thomas L. Geiger, County Counsel, Janice Amenta, Deputy County Counsel |